, 28  721'
40  179

PARIS R. HIATT v. MOSES P. KINKAID.

[FILED FEBRUARY 18, 1890.]

1. **Malicious Prosecution:** PROBABLE CAUSE: DAMAGES. One A., having no grounds on which to form a belief of the guilt of the accused, charged in a complaint under oath before a justice of the peace that certain drafts belonging to him, amounting to $3,627.19, were by "some person feloniously taken and carried away," and that he "verily believes that said property is now concealed by P. R. H. on his person in his dwelling house in which he resides, he knowing said property to have been stolen," there being no proof that the drafts were stolen or that the affiant had reason to so believe. A search warrant was issued and served on H., and the drafts in question produced, whereupon a writ of replevin issued at the instance of A. was levied thereon, and the criminal proceedings were thereupon dropped. In an action by H. against A. for malicious prosecution, *held*, that H. was entitled to recover damages, the amount being a question for the jury.

46

2. A Verdict not having evidence to sustain it on a material point
   will be set aside.

ERROR to the district court for Antelope county.   Tried
below before POWERS, J.

*O. A. Williams*, and *O. P. Mason*, for plaintiff in error.

*N. D. Jackson*, and *Allen Robinson & Reed*, contra.

MAXWELL, J.

This action was brought in the district court of Antelope
county by the plaintiff against the defendant, upon two
causes of action: First, for alleged malicious prosecution;
and, second, for the alleged conversion of certain drafts
which it is claimed the defendant wrongfully converted to
his own use.

The answer of the defendant is very long, but sets out
in detail his version of the case, and that portion of it re-
lating to the contract, drafts, etc., is as follows:

" Defendant admits obtaining the checks mentioned in
plaintiff's petition, not in the precise manner stated, but in
the manner hereinafter stated, and avers that he was, at
the time of so obtaining said drafts or checks, the sole
owner of them, and was entitled to the possession of the
same, and the possession by plaintiff of said checks or
drafts was unlawful, and plaintiff came in possession of
said checks or drafts of defendant in the dishonest, fraudu-
lent, and felonious manner, to-wit:

" Early in the summer of 1883 plaintiff induced defend-
ant to make plaintiff his (defendant's) agent to buy cattle
for him, and allow him to feed and fatten the cattle for him,
whereby it was agreed by the parties, plaintiff and defend-
ant herein, that the defendant was to have plaintiff, as his
agent, buy about seventy-four head of extra fine steers, the
same to be three and four years old, except a few extra two-
year old steers might be bought.

"Plaintiff was to perform the labor and devote the time necessary to buying and gathering said cattle, and to bear the expenses other than the cost price incident thereto, and was thereafter the collecting of the cattle at his home in Wheeler county, in this state, in the summer of 1883, to graze, feed, and fatten said steers, and make them fine beef cattle, ready for the market by the 1st day of June, 1884, and plaintiff was to feed said cattle corn and other food necessary to be used in fattening the same, and bear all expenses incident thereto, and to account to defendant, in money, for all cattle lost by him, and on the 1st day of June, 1884, defendant was to sell said cattle, and after he had first taken from the proceeds of said sale the original purchase price thereof, and a profit of 35 per cent, the balance of the proceeds of the sale of said cattle should be given to the plaintiff herein in consideration of his services and expenses hereinbefore mentioned. In pursuance of said contract defendant, by plaintiff, his agent, bought about seventy-six head of cattle and delivered them to the plaintiff to fatten, as above stated, which plaintiff undertook to do, but performed the same only partially.

"During the winter of 1883 and '84, in about the month of December, 1883, plaintiff failed to furnish the necessary food for said cattle, as he had agreed to do, and asked defendant to furnish food to feed said cattle until about June, 1884; whereupon it was then and there further agreed by and between plaintiff and defendant that defendant would furnish sufficient corn to feed or fatten said cattle; that when said cattle were sold by him, in addition to his first taking from the proceeds of said sale the original price of said cattle and the profits thereon aforesaid, he would also take, before plaintiff should have a part of said proceeds, the cost price of said corn or said food so furnished by him, the said defendant, to fatten said cattle, together with the amount of two promissory notes, of which the following are copies, to-wit:

Hiatt v. Kinkaid.

"$50.                     O'Neill, Neb., Nov. 20, 1883.

"One day after date, for value received, I promise to pay to the order of M. P. Kinkaid, $50, payable at Holt County Bank, O'Neill, Neb., with interest at 10 per cent per annum.

"P. O., Clearwater, Neb.

"Paris R. Hiatt and Wife."

"$100.                   O'Neill, Neb., Nov. 26, 1883.

" One day after date, I promise to pay to the order of M. P. Kinkaid, $100, payable at Holt County Bank, O'Neill, Neb., with interest at 10 per cent per annum.

"P. O., Clearwater.   (No. 66.)

"P. R. Hiatt and Wife."

" Said notes having been given to defendant by plaintiff for money borrowed, to be used in buying grain for said cattle, it then and there at the time of making said latter agreement having been agreed by plaintiff and defendant that the amounts of money for which said notes had been given should be considered as having been directly invested by defendant in corn to be fed to said cattle in the same manner and upon the same terms and conditions that he should, and was then and there about to, undertake to furnish corn to feed said cattle.

"In pursuance of said second agreement, defendant furnished corn to feed said cattle, which cost him at the market price and was worth $500. The original cost price of said cattle to defendant was $2,540, or about that amount, and the cost of the corn so purchased by defendant was $730, with amounts said notes represent, and on the first of June, 1884, the day upon which said cattle were by agreement of plaintiff and defendant herein to be sold. The interest of defendant in said cattle was the value of the same to the extent of $4,159, and the interest of the plaintiff in said cattle was the value of the same less $4,159, which interest of plaintiff was secondary, conditional, and subject

to the interest of defendant to be first realized as above set forth, and to the absolute exclusion, if necessary, of any interest of plaintiff.

"On or about the 25th day of May, 1884, the defendant, being the owner of said cattle, with the qualifications above mentioned, of the conditional interest of the plaintiff, and the plaintiff, designing and contriving to wrong and defraud the defendant, did unlawfully and wrongfully take seventy head of said cattle and convert the same to his own use and did embezzle the same for that, without the knowledge or consent of defendant.

"Plaintiff shipped seventy head of said cattle to the city of Chicago and sold the same and received for same sum of $3,627.19 and plaintiff received as part payment of the above mentioned price of said cattle so sold by him the three checks or drafts referred to in his petition. Said defendant being financially irresponsible, and defendant knowing this and well knowing that a judgment against him for the amount of the value of defendant's interests in said cattle would be unavailing to protect himself against an entire loss of said investment, on the 29th of May, 1884, at the village of O'Neill, Neb., did ratify the sale of said cattle by plaintiff; and by reason of the fact that defendant was the exclusive owner of said stock to the extent of $4,159 and that plaintiff had realized a smaller amount for the same than defendant's interest therein, and that said plaintiff had previously converted the other six head of cattle belonging to the defendant to his own use and never accounted to defendant for same (as hereinafter set forth), the defendant then and there thereby became the sole and exclusive owner of said checks or drafts referred to in said petition, the same then and there being in the possession of the plaintiff.

"On the 29th of May, 1884, at and in the county of Holt, aforesaid, defendant then and there being the exclusive owner of said drafts or checks and entitled to the

immediate possession of the same and plaintiff then and there being wrongfully and unlawfully in the possession of the same, the defendant demanded of plaintiff that he deliver up to him said checks or drafts, which the plaintiff refused to do and ran away; whereupon the defendant then and there immediately swore out a search warrant and placed the same in the hands of the sheriff, the following, as to words, figures, writing, print, and erasures, being a *fac simile* of the complaint upon which said search warrant was issued, to-wit:

"'THE STATE OF NEB., HOLT CO.:

"'The complaint of M. P. Kinkaid, of said county, made before me, John P. O'Donnell, a justice of the peace in and for said county, who, being first duly sworn, deposes and says: That on or about the 29th day of May, 1884, in said county, the following described property of M. P. Kinkaid, to-wit, checks and drafts made payable to the order of Hiatt and Kinkaid, drawn by firms in Chicago, Ill., amounting to $3,627.19, or about that amount, that said property belongs to affiant, M. P. Kinkaid, was by some person feloniously taken and carried away from said O'Neill City, in said county. Affiant further says that he verily believes that said property is now concealed by P. R. Hiatt in his dwelling house in which he resides, he knowing said property to have been stolen.'"

It is unnecessary to notice the reply.

On the trial of the cause the jury returned a verdict for the defendant, upon which judgment was rendered.

A large number of errors are assigned, the more important of which will be noticed in their order.

The original contract of the parties is contained in the following letters:

"*Mr. Kinkaid:* SIR—Yours of the 2d and 7th just received. In reply I will say that we need a contract or bargain signed by both of us. I am ready for business as

soon as you make out your papers authorizing me to buy as your agent for such part of the profits as is named—all profits above 35 per cent in figures; steers kept one year and sold fat.      Yours truly,      PARIS R. HIATT."

"O'NEILL CITY, NEB., 5-28-'83.

"*P. R. Hiatt, Esq.:*  DEAR SIR—Unexpectedly I was away from home all of last week but one day, which circumstance prevented my sending to begin with as I had written to do.  I sent you, by mail, a check book and some blank bills of sale.  Take a bill of sale for each lot that you buy, and send them to me as it becomes convenient.  My understanding now is that you buy, take care of and fatten the cattle, pay all damages caused by cattle trespassing upon the property of others, and that I pay you for the same all profits to me over and above 35 per cent net profit. With this understanding you may begin to buy and check out funds, and to pay for the same as you buy.

"Return this sheet to me by return mail, signifying your acceptance of these terms.  The cattle are to be ready for the market by about June 1, 1884, but may be sold previously if the prospects seem to demand it for our mutual interests.  Write your acceptance herein and return it by return mail.      Yours truly,      M. P. KINKAID."

The letter or postal card, and to which the above letter is an answer, was written in May, 1883 but the exact date does not apear.  They together constitute the contract in this case.

In order to understand this proposition and answer fully it is necessary to consider some of the correspondence leading up to it and in connection therewith.

In April, 1883, Hiatt sent to the defendant the following letter :

"CLEARWATER, NEB., 4/3/83.

"*M. P. Kinkaid:*  SIR—I would ——— much to buy cattle ———.  This year will buy the ——— in your

name and give you security that will insure you against all losses that might occur from depreciation or poor judgment in buying, or anything else which might cause a loss, for all profits over 35% of the money used; or, if you rather, I will give ½ the profits, which, no doubt, would make you 100%, but I would not insure; but I think that I can buy and sell several lots of cattle during the year which would be very profitable to both of us and would rather do so. I have found out where I can buy so as to make 75% between now and July without much risk, if any.

"If you would like in any shape, please state me the particulars, or, if you would like to see me, the man that is intending to make us the loans on real estate lives at Albion; I think that he will get it fixed soon and then we can pay you the balance. Many thanks to you for past favors. You will have all our good wishes and it will do you no harm and all the good it can.

"Yours truly,    PARIS R. HIATT.

"——— Rs."

The loans referred to relate to debts apparently secured by chattel mortgage which the plaintiff was owing the defendant prior to the transaction in suit. In answer to the above letter the defendant wrote as follows:

"*Paris R. Hiatt:* DEAR SIR—Yours of the 10th before me and I enclose thereof a written contract signed by me, which, if it suits you, you may sign and copy and return it to me or you need not copy it and I will copy it, sign the copy and send it to you. Your first offer was to allow me $1,200 for the use of $2,400, or 50% for the use of my money; you next wrote you would insure me 35% or give me ½ of the profits, whichever I choose, that the latter might make me 100%.

"I prefer to go into the matter as a speculator rather than as a money loaner and have written up the contract to have ½ of the profits; you are better posted on what is

customary than I, and know better whether this is fair—at any rate this is your offer.

"Yours truly,     M. P. KINKAID.

"P. S.—What kind do you expect that you will buy, mostly two or three years old? Write at once, as I want to go away on business."

This proposed contract was returned by Hiatt without his signature.

There is also a letter as follows:

"AUGUST 3, 1883.

"*P. R. Hiatt, Esq., Clearwater:* DEAR SIR—Your card is before me. I meant you to understand when I met you at Clearwater, not to buy any more cattle at this time, but it seems that you did not so understand me. Buy no more until again authorized to do so. I instructed the bank several days ago that no more checks would be sent in, but will have them pay this one for $35. If Warner has not accepted the check now he need not accept it at all. He has no right to hold a check several weeks and speculate on prices.

"I want no more cattle now at any price and will buy no more until prices have become settled. The best judges say that prices have declined fully one-third.

"Acknowledge receipt of this and oblige,

"Yours truly,     M. P. KINKAID."

Also a receipt dated 8–19–'83, as follows:

"O'NEILL, HOLT CO., NEB., 8–19–'83.

"Received back from Paris R. Hiatt one certified check for $205, of Holt Co. Bank, signed by M. P. Kinkaid, the same unused.         M. P. KINKAID.

"I hereby release all claim to one pony, branded O. K. on left hip, to P. R. Hiatt, in consideration of $75 hand paid, August 19, 1883.         M. P. KINKAID."

Also the following letters from the plaintiff:

"CLEARWATER, NEB., 4–27–'83.

"*Hon. M. P. Kinkaid:* DEAR SIR—Yours of 22d and 23d received. In reply say that I don't think but what I can get plenty of 2 at $25 and 3 year old steers at $35 of a good quality. About three weeks back there has been a great rush for steers, but it is over now to a great extent, as buyers became discouraged, so I think that the market is weakening considerable. My object is not to rush, but do considerable hunting around, get them as much below · the market as possible. Anything well bought is half sold. Corn 20c per bu. I don't know, but I think about the 10th of May would be a good time to commence buying. I can handle 200 head of steers if you want to invest that much. I can pay you what I am owing next week if you are anxious. * * * Yours truly, PARIS R. HIATT."

"CLEARWATER, 7–18–1883.

"*Hon. M. P. Kinkaid:* SIR—I have bought cattle per bills enclosed. The horse that I paid $60 for I put in on the yoke of oxen, and the bull and the 3 year old steer, valued at $175, the check for $60 finished paying; then my horse's back gave out and I was compelled to buy another which cost $75, is more than worth the money. I will replace soon in cattle or cash. The steers that I have bought are extra good so far, and I have got them for less than three cents per pound. The cattle up west are considerable better quality than they are east, and I can get them cheaper. I could have bought 10,000 head before now, of course, but it has been a downward market all the time, and I am aiming to make 20% on the purchase; I have the promise of about all that I want at figures I can stand.

"Those bills of sale drawn in my name were on account of the men wanting their bargain with me and would not sign any other way. I acknowledge the property yours and for your use and benefit, and only used my name for convenience. Yours truly, PARIS R. HIATT."

And under date 3–15–'84, a letter which concludes as follows:

"I am so sorry that you cannot come down to see the cattle. I hate to ask you for money to buy corn and carry on my business with the cattle when you do not know how things are. I do not feel like asking you to take my word for everything as you are doing.

"Please send Mr. A—— or some one to see that matters are all right. I consider myself trustworthy in ordinary matters, but this is certainly something that I think you had ought to have attended to long ago. I would not have trusted any man on earth so much and so long. I will be at home Monday, 17th. Tuesday I have to go to court.                    Yours truly,       P. R. HIATT."

Also a letter dated Neligh, 3–10–'84, as follows:

"*Hon. M. P. Kinkaid:* SIR—I have sold or bargained to sell one car of the tail of the steers at a good price; they will come to a little over 50 per head; the rest is worth 75. I can contract them to the same men for 6 cents; feed out will be $90 per head. I want you to go to Clearwater to-morrow morning, Tuesday. Messrs. Penn and Russell will meet you there and take you to my house. Be on time with both feet.

"Yours truly,      P. R. H."

This sale does not appear to have been completed.

Also letter dated Clearwater, 5–21–'84, as follows:

"*Hon. M. P. Kinkaid:* SIR—I am now compelled to ship cattle; will load 23 afternoon. I suppose that it will be all right to order money returned to Holt Co. Bank, O'Neill. I am sorry I could not hold until for three weeks. I could not trade with Harr; he said that the cattle would not net over $4,000. I think $5,000. They look very good now; one-half of them will not be considered only fair cattle, but one-half will be good shipping cattle if I make a quick trip. Mr. O. Phillips will assist

me through and in selling.    Will consign 2 cars to Patter-
son Bros., 2 cars to Scott and Amos.    I want to make
competition so as to get good price.

> "Yours truly,        PARIS R. HIATT."

There is also a telegram from the railroad agent at Clear-
water to the defendant as follows:

> "THE WESTERN UNION TELEGRAPH CO.
>          "CLEARWATER, NEB., 26, 1883.
>
> "*M. P. Kinkaid, O'Neill:* Consigners, Hiatt and Kin-
> kaid; cars 39, 31, and 749 consigned to Scott and Amos,
> and cars 30, 71, and 597 to Patterson Bros.
>                          "T. R. HALDERMAN."

The defendant telegraphed to the consignees of the stock
at Chicago and received the following telegrams in answer
thereto:

> "THE WESTERN UNION TELEGRAPH CO.
> "Received 10:40 A. M., May 27, 1884.
>          "Dated UNION STOCK YARDS, ILLS., 27.
>
> "*To M. P. Kinkaid, O'Neill:* Chicago drafts given for
> net proceeds in names as billed.    SCOTT AND AMOS."

> "THE WESTERN UNION TELEGRAPH CO.
> "Received at 10:40 A. M., May 27, 1884.
>          "Dated UNION STOCK YARDS, ILLS., 27.
>
> "*To M. P. Kinkaid:* Sold yesterday; gave checks to
> Hiatt, order of Hiatt and Kinkaid, No. eighteen thirty-
> six.                        PATTERSON BROS. & CO."

On the 29th of May, 1884, the plaintiff returned to
O'Neill with the drafts for the cattle.    Two of these drafts,
which in the aggregate amounted to $2,836.07, were taken
in the names of Hiatt and Kinkaid and payable to their
order, and one of said drafts, calling for $750.12, was pay-
able to the order of P. R. Hiatt.

The plaintiff in his direct examination, after stating his
arrival at O'Neill, testifies as follows: "I met him [Kin-

kaid], and shook hands with him, and he said, how did you get on; I said, not as well as I expected ; I struck a bad market, and I pulled out the statements from the commission men, what the cattle had brought, and I handed them to him.   He asked me if he could keep them over night; I told him that he could keep them over night and keep them always if he wanted to.   He said that he had been out in the country that afternoon and he presumed that I was tired—I was not feeling very well; he said that I had better go back to the hotel and stay all night and come back the next morning.   I did not feel very well, my health was poor, and I went to the hotel.   I stayed all night. The next morning I went back to the office three times —three times I went back.   There are three rooms in the office, in this shape (the witness illustrating to the jury by drawing with his finger on the floor).   There was a room that you went into first, then there was a middle room, and then there was a back room.   Mr. Adams was in the office and he said that Kinkaid had not got up yet, and I think that I went into the middle room and Kinkaid did not have his clothes on yet.   When he had got his clothes on, he took a chair and sat down by the table and I sat down too, and he said, let me see those drafts or checks— I believe that he called them checks, and that he said checks—and I said to him that I wanted to settle, that I wanted to see what he had that belonged to me, my checks that I had got in the Holt County Bank, and he said to me, you shipped those cattle in a firm name that never existed and you had no right to do so, and he says, hand me out those checks, and I refused to do it.   I did not like that kind of a way of settling up.   I don't exactly know what was said, he seemed to be mighty angry at me, and then he says, hand out those checks like a man, you agreed to be a man, now hand them out, and I refused to do it.   He then said he would arrest me if I did not."

On that point the defendant testifies as follows:

A. It was the latter part of May—I would not say the exact day.

Q. Where did you meet him when he returned?

A. I met him in my office one evening about sun-down, or possibly it was after sun-down.

Q. And that was at O'Neill?

A. Yes, sir.

Q. Did Mr. Hiatt at that time give you any statements or papers as to the sale and the proceeds of the cattle?

\*     \*     \*     \*     \*     \*     \*     \*     \*

Q. What conversation did you have at the time Mr. Hiatt gave you these statements marked Exhibits Nos. 32 and 33, the statements from the commission men?

A. We were together but a short time that evening; I asked him how he got along and he produced these statements, and I was just going to call on him for the checks, he turned around on his chair and wanted to know if I was sick; I told him that my health was good; he said that he was sick and tired, and that he would like to go to the hotel, and he wanted to know if it would not suit just as well to fix it up the next morning; I told him that it would; he said that he was going to leave on the train the next morning, and the train went east at 9 o'clock. My recollection is that I told him to come around before breakfast and I would wait for him and fix it up before I went to breakfast; then he went away.

Q. Did he stop at the same hotel with you that night?

A. I was not stopping at the hotel then.

Q. The next morning he came around?

A. Yes, sir.

Q. You may state what was done and said the next morning, how the conversation opened up, what was said and done by each party.

A. He said "Good morning," when he came in, as usual, and I received him as usual, and I sat down at the table and laid these two statements before me — he stood

up most of the time—and then I asked him for the exchange.

Q. What do you mean by the exchange?

A. His drafts, the proceeds of the cattle.

Q. Well, did he say anything?

A. He wanted to see how we stood first; he wanted his pay for the feeding of the cattle; that he had worked hard in taking care of them, and I think that he said that it was worth or had cost him as much as $1,500; that his wife had worked hard in taking care of the cattle; and I said to him, "If you wish me to be generous or charitable with you, give me the checks and it will be time enough afterwards." He said that he would not do so; he insisted that he wanted his pay for feeding the cattle.

Q. What did he claim at that time; what did he want you to do before he delivered the checks?

A. Pay for feeding the cattle.

Q. Was anything said that he wanted to figure up and find out how much he owed on the notes and checks?

A. There was not a word said about the notes or checks; he wanted to figure up and see how much was coming to him for feeding the cattle.

Charges of fraud are made against the plaintiff in the briefs of the attorneys for the defendant without any evidence to sustain them. It is asserted that the plaintiff shipped the cattle without the knowledge of the defendant, but the proof shows that he was notified not only by the plaintiff, but by the agent of the railroad company. The cattle seem to have been shipped in pursuance of the contract made May 28, 1883, to hold them one year, and there is no claim, or at least no proof, that the plaintiff did not make as good a sale as the market would justify.

The testimony shows that the corn to feed the cattle was exhausted; that the plaintiff some time before had notified the defendant that it would be necessary to purchase more corn, and that it was desirable to keep the stock a few

weeks longer. The defendant, however, seems to have paid no attention to these requests. Being without feed to continue the fattening of the cattle, it is difficult to perceive what else the plaintiff could have done, except to send them to market; otherwise they would have depreciated in value from loss of flesh.

Under the circumstances, therefore, the plaintiff seems to have pursued a course which would conserve the interests of both parties. It may be said, however, that he had agreed to furnish feed for the stock and that his failure to do so was a breach of his contract. We do not understand the contract to require him to furnish corn at his own expense.

He testifies that he fed all that he had on his farm—about ninety acres—and then requested the defendant to let him have money to buy corn, which he seems to have done. This was a joint enterprise; the defendant entered into it as a "speculator" and not as a money loaner.

The proposition of the plaintiff was to give him thirty-five per cent of the profits. This was accepted by the defendant with the understanding that he was to have thirty-five per cent of the "net profits." The cattle evidently were not to be bought at one purchase, but the plaintiff was to go around the country and pick up one here and there where it could be bought to advantage, and necessarily must incur some expenses. These, we think, are the expenses referred to and not the cost of the grain necessary to fatten the stock. Such cost forms a very large and important item in fattening stock, and no doubt would have been expressly agreed upon if intended to be paid solely by the plaintiff. That question, however, probably is not material in this case at this time.

It is evident that two of these drafts, aggregating more than $2,800, were intended for the defendant and would have been delivered to him on a settlement of the accounts between the parties. There is testimony in the record

tending to show that fat steers in the spring of 1883 found a ready market in Chicago at a very high price, while corn in the vicinity of the parties to this action was worth but twenty cents per bushel, and that at the comparative prices of corn and beef cattle there was a very large profit in fattening steers.

The testimony also tends to show that during the summer of 1883 there was a very considerable decline in the prices of fat stock, and that in consequence thereof the defendant had notified the plaintiff to cease purchasing. The stock in question seems to have been purchased at a fair price as prices were then current, although in a declining market. The corn that the defendant furnished was charged to the plaintiff's account, and it would seem but justice that the corn furnished by the plaintiff should be charged to the general account also, and paid for before dividing the surplus. The plaintiff, therefore, in attempting a settlement with the defendant said to him, in effect, that the enterprise had proved unprofitable and that he wanted a settlement of the account between them, claiming that he and his wife expended about $1,500 on the stock. It is probable that this would have been reduced considerably had an accounting been had, but of this we do not know.

A request for a settlement, so far as we can see, was a reasonable demand. The defendant had gone into the enterprise as a speculator. This implies that he took his chances of the venture proving a success. If it did not do so—if there were losses, then they must be borne by one or all of the parties engaged in the matter. Here were losses; that is, the cattle had not sold for as much money as they had cost, together with the cost of the corn that had been used to fatten them.

Suppose one-half of the cattle had died without negligence on the part of the plaintiff, it is pretty evident that the loss of such cattle would have fallen on the defendant. Here, however, is a loss for the value of the food used to

47

fatten the stock, and this loss must be apportioned between the parties.

There were other matters to adjust.

Thus: seventy-six head of stock were purchased. Of these, seventy head were shipped to Chicago, six head were disposed of in various ways, the title to one after considerable litigation had failed, and but little was realized from the six. The possibility of loss does not seem to have been considered by the parties at the time of making the contract, but like all transactions where success depends upon the vicissitudes of climate, markets, health, etc., disappointment is liable to be the result in place of profit. Therefore, if the defendant is given the benefit in argument of all that he claims to have paid out for the cattle and corn, viz., $3,390, he was not entitled to all these drafts. It is probable, too, that these amounts claimed by him will be somewhat reduced on a final settlement.

The plaintiff was met with an absolute denial of settlement on the part of the defendant and a demand for the drafts as his own. Failing to obtain them in this way the defendant instituted a criminal charge against the plaintiff, "that the following described property belonging to M. P. Kinkaid, to-wit, checks and drafts made payable to the order of Hiatt and Kinkaid, drawn by firms in Chicago, Ill., amounting to $3,627.19, or about that amount, that said property belongs to the affiant, M. P. Kinkaid, was by some person feloniously stolen, taken, and carried away from O'Neill City, in said county.

"Affiant further says that he verily believes that said property is now concealed by P. R. Hiatt on his person in his dwelling house in which he resides, he knowing said property to have been stolen."

There is no testimony in the record tending to show that the drafts in question had been stolen, or that the defendant had any reason to so believe. So far as the record before us shows, the charge was a rash assertion under oath, and

there was no attempt to sustain it by proof of the specific act charged.

The testimony shows that the search warrant and writ of replevin were both in the sheriff's hands at the same time; that the plaintiff was taken to the office of the justice, and he then demanded to be permitted to see an attorney, which was refused; that there, in the presence of the justice, the sheriff, and the defendant, he was partially stripped, and the draft for $750 and about $40 in money found on his person; that he thereupon was taken to a bedroom and stripped nearly naked, and the drafts to Hiatt and defendant found in the lining of his overalls.

No one can read the testimony in this case without being convinced that the criminal prosecution was instituted for the sole purpose of getting possession of the drafts in question. The whole course of procedure, both before and after the arrest, shows this to be the case. The drafts, when found on the person of the plaintiff herein, were levied upon under a writ of replevin in an action instituted by the defendant. Having thus obtained possession of the drafts the criminal charge was permitted to lapse. It is true the defendant pleads as an excuse for so doing that he was called away on professional duty, and therefore could not be present to prosecute, but it is evident that the real reason was a want of proof to establish the charge. The charge of felony against any person is of a very grave character, and should not be made unless there is a probable cause for making the same. The charge may cast a cloud upon the good name and reputation of a person that long years of exemplary conduct will not wholly efface. To justify the charge, therefore, there must be probable cause.

As stated by GANTT, J., in *Turner v. O'Brien*, 5 Neb., 544: " The defendant, however, may show the existence of probable cause, the absence of malice, or that he acted under an honest belief that the plaintiff was guilty of the offense with which he was charged, but this belief must

Hiatt v. Kinkaid.

have been founded on such reasonable grounds and circum-
stances as would have induced a man of ordinary prudence
and discretion to believe in the guilt, and expect the
conviction of the person charged with the crime.

"Therefore, the essential elements which constitute
grounds of defense, in an action for malicious prosecution,
are absence of malice, and honest belief in the guilt of the
person charged, and a 'reasonable ground of suspicion, sup-
ported by circumstances sufficiently strong in themselves to
warrant a cautious man in the belief that the person is
guilty of the offense with which he is charged.' And these
last two elements must unite, for good faith, merely, may
be based upon mere conjecture—it may be founded upon
mere suspicion, unsupported by any act or circumstance
tending to show that the accused is guilty, and, hence, belief
itself will not protect the prosecution from liability."

The criminal law of the state is to be used on behalf of
the people for the purpose of punishing crimes and thus
preventing as far as possible the violation of the law.
It is not a weapon to be placed in the hands of a private
individual to enable him to accomplish his own private ends
—more particularly to thereby collect claims in his favor.
For such purposes the Civil Code has placed all the reme-
dies known to the law at the disposal of the creditor. If,
however, in disregard of the rights of a party he institutes
criminal proceedings against him without just cause and
as a means of acomplishing a private purpose, he will be lia-
ble for the consequences thereof. As no probable cause is
shown, the plaintiff was entitled to recover damages in his
action for malicious prosecution, the amount being a ques-
tion for the jury.

Some objection is made to the complaint, that it fails to
state an offense. We do not deem it necessary to discuss
that question, as by this means the defendant intended to
and did procure the arrest of the plaintiff and searched his
person and obtained the drafts. Until there is an account-

ing between the parties the proof fails to show that the defendant was entitled to the draft for $750.

It is true the title of the cattle was in him, but merely as security for the purchase price, only in the nature of a mortgage, and both parties had an interest in the stock, the amount of which can only be determined on the settlement of the accounts. In such settlement or adjustment of the balance between the parties the defendant cannot preclude any defenses in favor of the plaintiff which would have been available to him in an action for an accounting; in other words, he can gain nothing by his wrongful procedure in the case. The plaintiff claims to have purchased the stock in question of the defendant in August, 1883, for about $3,000. This, however, is denied by the defendant and will not be considered. The proper procedure on the part of the defendant would have been to file a bill for an accounting against the plaintiff and enjoin him from transferring the drafts in question. No doubt upon a proper showing a court of equity having a party within its jurisdiction would require him to deliver up to the clerk of the court, or other person, any valuable papers in his hands which were liable to be misused or mislaid, and would enforce its order, if necessary, by imprisonment. The accounts between the parties could then have been adjusted and the drafts applied in satisfaction of the decree.

If it is objected that such process is necessarily slow and the creditor is compelled to wait for his money until the final decree, the answer is that this is the remedy the law gives. The courts are continually open, and every person for an injury to his property, person, or estate, has a remedy by due course of law, and these remedies are open, if the facts will justify their use, to every person having business relations with another. If the parties cannot agree, the courts necessarily must determine what their respective rights are and judge between them.

It may be said that this course was attempted in *Kin-*

*kaid v. Hiatt*, 24 Neb., 562.  In that case, however, it appeared that the plaintiff therein had, by means of a search warrant, obtained the drafts on the person of the defendant, whereupon he caused them to be levied upon under an order of replevin.  He thereupon brought a bill of peace to enjoin the trial of the action of replevin and actions brought against him by Hiatt.

The court held rightly, we think, that such an action could not be maintained; but that was very different from an action for an accounting.  In that case the plaintiff therein, having obtained the drafts in dispute, sought to retain them and have the courts sanction the unlawful methods taken to accomplish the result and prevent a trial of the very issues raised by himself.

The evidence wholly fails to support the verdict and the judgment is reversed and the cause remanded for further proceedings.

REVERSED AND REMANDED.

THE other judges concur.